**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Cr. No. 06-340** |
| ) | |
| **v.** ) | **Judge Ellen Segal Huvelle** |
| ) | |
| ) | |
| **MARILYN M. ESSEX** ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant Marilyn M. Essex, through undersigned counsel, respectfully submits this memorandum in aid of sentencing. We respectfully request that the Court, after considering, the totality of the record in this case, and the relevant factors as set forth in 18 U.S.C. § 3553, sentence Ms. Essex below the guideline range in this case. The reasons supporting this memorandum are set forth below.

## I.    INTRODUCTION

Marilyn Essex comes before the Court for sentencing after having pled guilty to one count of Interstate Transportation of Stolen Property in violation of 18 U.S.C. § 2314. Her criminal conviction arises from a scheme under which Ms. Essex embezzled monies from her former employer, MDB Communications. The total amount taken was approximately $656,000 according to the victim. Ms. Essex has already made restitution in the amount of $278,000.

Ms. Essex is 56 years old. She has no prior contact with the criminal justice system and, prior to committing the present offense, was a law-abiding and productive citizen. For the vast majority of her adult life, her major objective and preoccupation was to be the single mother of her two daughters who are now 26 and 21 years old.

1

Ms. Essex offers no excuses of justifications for her conduct. She stole money from her employer, and violated a trust placed in her when she did so. She understands very well the wrongfulness of her actions and the harm and distress that she has caused the victim in this case, Carey Hatch, MDB's owner. Ms. Essex is remorseful and ashamed of what she has done. She also understands that she must be punished and pay a price for her conduct.

Of her own doing, Ms. Essex has suffered as a result of her conduct. Her actions have devastated her family emotionally and financially. As a single mother, she sought to teach her two daughters good values. But now, she stands before not only the Court, but also her daughters and her entire family, suffering the highest form of moral approbation for failing to adhere to the morals standards she was taught and those she tried to instill in her daughters.

While we offer no excuse for Mr. Essex's conduct, we ask the Court to take into consideration the extraordinary level of accepting responsibility and making restitution for her crime. When Ms. Hatch discovered the scheme and confronted Ms. Essex, Ms. Essex did not try to make excuses or avoid responsibility. To the contrary, she immediately took responsibility and used every financial resource available to her to make restitution to Ms. Hatch. Ms. Essex signed her home over to Ms. Hatch's lawyer. She liquidated her retirement account and signed the funds over to Ms. Hatch. She sold her car. She gave Ms. Hatch's lawyer a pair of diamond earings worth $2000 for the purpose of contributing to the restitution. She gave up her home furnishing and almost all her personal possessions to Ms. Hatch's lawyers.1

---

1 Ms. Essex signed over the deed to her home and other property to Ms. Hatch's lawyer, Philip A. Gorelick, who then oversaw the sale of that property. As a result, Ms. Essex does not have documents that show the precise amount of restitution. However, Mr. Gorelick has indicated to undersigned counsel that the total amount of restitution is approximately ***$278,000***, which includes (1) $225,000 from the sale of the home, (2) $33,000 form the liquidation of Ms. Essex's retirement account, (3) $18,000 form the sale of Ms. Essex's automobile, and (4) $2,000 from the sale of a pair of diamond earings.

As a result, Ms. Essex is now essentially homeless and must rely on her family members for a place to reside. Ms. Essex will most certainly lose her current job and will likely never work in her field again.

While Ms. Essex must pay a price for her conduct, she is a different and better person today than when her actions were discovered over two years ago in February 2005. For the reasons set forth below, we respectfully submit that balancing Ms. Essex's lack of criminal record, her positive contributions to her family, her immediate and extraordinary acceptance of responsibility, both in her acknowledgment of her crime and in the steps she took to make voluntary restitution, and the severe consequences that have stemmed from this matter, demonstrate that pursuant to 18 U.S.C. § 3553 and the advisory guidelines, that a period of incarceration below the guidelines is just and fair in this matter.

## II.    BACKGROUND OF MARILYN ESSEX

### A.    Upbringing

Ms. Essex is one of nine children, born in the Washington area in 1951. Ms. Essex's parents were never married and her alcoholic father essentially disappeared from the family's life leaving Ms. Essex's mother to raise nine children by herself. Ms. Essex was raised in an impoverished family. Ms. Essex's mother did what she could to provide for her nine children, but her modicum salary was not enough to keep the family from being continually evicted for inability to pay rent.

Growing up, Ms. Essex's life revolved around taking care of her younger siblings. Throughout Ms. Essex's childhood, she had a nurturing and close relationship with her mother and eight siblings. With her mother working outside the home until late in the evening, Ms. Essex willingly took on the role of second "mother" to her younger siblings. After school, she

would care for her younger siblings, cook for the family, and take care of the house.  Ms. Essex's

younger brother, David B. McDonald, a retired D.C. Police Commander, explained:

> Marilyn was one [of the children] that always had expectations on her.  Being the
> middle child it fell to her to take care of the four younger kids in the family as our
> Mother worked until late in the evening.  Marilyn would come home after school,
> and later work, and prepare dinner for us kids and our Mother.  She consistently
> did so for many years, without complaint or anger.
> . . .
>
> While I was growing up in junior high school and high school Marilyn
> consistently loaned her car to me, even though I was an inexperienced driver, so
> that I could go on dates or just hang out with friends.  She never resented the fact
> that she had the only car in the family and others relied on her for rides or support.
> Our Mother never learned to drive and was completely dependant on Marilyn for
> rides to work or the grocery store.  Marilyn always provided assistance to us.  She
> was always willing to help and support us.

Letter attached as ***Exhibit 1***.  Notwithstanding the fact that she worked two jobs, attended school,

and cared for her family, Ms. Essex became the first in her family to graduate from high school

in 1969.  She later received a Bachelor's Degree from Benjamin Franklin University and a

Masters in Business Administration from Johns Hopkins University in 2004.

### B.    Marriage, Family and Good Works

In 1975, Ms. Essex married Thomas Essex.  They had two daughters.  The oldest

daughter, Kristen, is now 26 years old.  Ashley, their second, is 21 years old.    After the children

were born, Ms. Essex's existence revolved around her children.  She sought to provide a loving,

nurturing, and financially secure family.  In 1992, her marriage ended in divorce due to her

husband's infidelity.  Emotionally devastated, Ms. Essex found herself in the same position as

her own mother had been in:  single and raising a family on her own.

While Ms. Essex's divorce created hardships, she continued to support her children in

any way she could.  She was very involved in her children's daily activities including, school,

sports, and their social lives.

Despite the financial strain, Ms. Essex sought to ensure that her children received the education

they needed by sending them to a private Catholic school.  Her daughter Kristen explained:

> My mother had to sacrifice more of herself [when she placed Kristen in private
> school] because my father refused to pay any money towards tuition.  My mother
> worked full time while my sister and I attended school and/or daycare.  My
> mother would rush home every night from work to pick us up on time then she
> would take us home a cook a nice dinner.  My mom wanted to be sure that we sat
> down to dinner every night as a family.  She could not provide us with every
> material item we wanted but she could make sure we were a family.  On certain
> weekends a month my mom would work at our school's Bingo night in order to
> receive a discount on tuition.

> Once Ashley reached school age she was also enrolled in private school.  My
> mom was giving all the money she made over to us in the form of tuition and our
> needs as growing children and she was giving most of her time to us as well.
> Ashley and I grew up participating in various sports and activities.  My mom was
> always sure to be at our events.  Many of our friends came from families with two
> parents and still did not often have a parent present at games, recitals or other
> events.  We could always count on our mother to be there for us.  She truly
> sacrificed more than most parents to make sure Ashley and I never felt we were
> from a broken home.

> As we got older and the costs of tuition and raising two girls increased my mother
> still did not receive extra help from our father.  Even as we went off to college the
> cost of tuition was left solely to my mom and any financial aid and scholarships
> we could receive.  I know this was difficult on her and she managed as best she
> could.  My mother always gave everything she could to my sister and me.

Letter attached as *Exhibit 2*.  Kristen's friend, Jennifer Pena stated:

> Marilyn was always very involved in her daughters' lives whether it was to make sure
> that they excelled in academics or enjoyed their youth without getting in trouble.  She
> made it a point to know all of her daughters' friends including myself . . . Every time I
> was at Marilyn's house I knew what a real family was like.  You could feel the love in the
> air and I knew that she always wanted more for her children then she ever had and above
> all she wanted them to be happy.

Letter attached as *Exhibit 3*.

Ms. Essex has proved to be a good role model and mother to her daughters.  She is

considered a loving and giving friend and member of her family,  as attested to by the family and

friends that have submitted letters attesting to her character.  *See* attached letters, *Exhibits 1-8*.

Ms. Pena explained that after she graduated from college, she had nowhere to live:

> [w]ithout a thought Marilyn told me to stay with her until I could get myself on my feet again . . . At first I was a little worried about how it would be to live with one of my friend's mothers. But I soon realized she was more than that, she was actually a mother to me. She took me in when I had nowhere to go. She was there to listen to me when I was upset or when I was happy . . . I will always be grateful for everything that she has done for me and for her ability to care for me as her own daughter.

Ex. 3.

Ms. Essex has and continues to strive to be a good friend, family member, and mother. At the same time, she realizes that her bad judgment and criminal conduct in this case deeply affects her children and family. She has struggled to cope with the fact that her actions in this case contradict what she has taught her children. Acknowledging her wrongdoing and making efforts to make restitution, Ms. Essex is attempting to remain a positive influence in her children's lives and to lead them by example.

### C.     Offense Conduct

As the Court can see, Ms. Essex's life has revolved around trying to do more, both emotionally and financially, for her children than what Ms. Essex had growing up and more than Ms. Essex could realistically provide. It was against this backdrop that Ms. Essex made terribly wrong decisions that resulted in the criminal conduct for which she stands before the Court.

In 1999, Ms. Essex was hired at MDB Communications in the District of Columbia as controller. While not meager, she found that her $40,000 annual salary was not enough to provide for Kristen and Ashley. Both girls were attending private school. Tuition was costly, not to mention the cost to provide for the girls' basic needs, including, clothing, housing and food. Her ex-husband, her daughters' father, refused to provide any financial support for their schooling and only provided minimal other financial support.

While clearly wrong, Ms. Essex rationalized that taking funds from her employer was necessary to provide for her children. It was under this financial stress that Ms. Essex began to write checks out to herself and her credit card from her employer's bank account. Ms. Essex's brother, David B. McDonald, explained:

> This caring and giving attitude is why I believe that she committed the offenses that she did. Marilyn took her divorce from her husband, and high school sweetheart, very hard. It took her many years to overcome her hurt and anger of being abandoned to raise tow young daughters by herself. As being raised by a single Mother, Marilyn never thought that she too would be a single parent of multiple kids with little income or assistance from her ex husband. But she was now. Alone, scared, and broke, Marilyn was too proud to ask her siblings for help or assistance. She had always been the provider and support for all of us. How could she ask for assistance? Unfortunately, Marilyn made a mistake and took the wrong path. But knowing Marilyn as I do I know that she stole the money not for herself, but for her kids. She needed to make sure that they had what they needed and never felt as poor as she did as a kid.
> ***
> She did not steal out of greed or selfish reasons, but to take care of her daughters.

*Ex. 1* at 2.

We respectfully submit that Ms. Essex's motivation for committing the offense was not blatant greed and avarice, but rather, arose from a desire to provide a better life for her daughters.

In February 2005, Ms. Essex's employer discovered her embezzlement. Upon being confronted, Ms. Essex immediately confessed her wrongdoing both orally and in writing. Almost immediately, Ms. Essex began working with lawyers representing Ms. Hatch and took extraordinary steps to attempt to make restitution to her prior employer. She voluntarily cooperated with her employer's investigation into the fraud. Ms. Essex agreed to liquidate all of her her assets and used every financial resource within her control to make restitution. Ms. Essex moved out of the family home, and signed the home, complete with its furnishings, over to her prior employer. Ms. Essex surrendered her 401K retirement account to Ms. Hatch. She sold her car and personal possessions and gave the proceeds to her prior employer.

### D.    **Post-Offense Background**

The impact that his crime has had and will have on Ms. Essex cannot be understated. The shame and humiliation she feels for committing this crime is immense. The lives of her family will never be the same as a consequence of her conduct. As a result of Ms. Essex's criminal conduct, she most certainly will be terminated once this Court has imposed its sentence. She will likely be unable to work in a financial position ever again. Additionally, she will be a convicted felon for the rest of her life.

While Ms. Essex's present case has deeply impacted her entire family's mental and emotional health, Ms. Essex has used the situation in a very constructive manner to show her children that even after making poor choices and decisions, one can take responsibility, ask forgiveness, and do whatever one can in an attempt to right the situation. Ms. Essex took enormous steps to repay her prior employer the debts that she owes. Once the criminal case began, she immediately pled guilty in an effort to take full responsibility for her conduct. Ms. Essex has done everything in her power to make right the wrongs that she committed both to her family and her prior employer. As her brother stated, "Marilyn didn't run from what she did. She tried to correct her mistake and make it right. Even then she was showing her daughters and us the right way to admit our mistakes." ***Ex. 1*** at 2.

**III.    ADVISORY GUIDELINES SENTENCING RANGE**

Under the plea agreement, Ms. Essex's base offense level is 6 pursuant to the pertinent guideline, U.S.S.G. § 2B1.1(a)(1).  The parties agree that the loss amount exceeds $400,000, but is less than $1,000,000, resulting in a 14-level increase pursuant to U.S.S.G. § 2b1.1(b)(1)(H). The parties also agree that due to Ms. Essex's role in the offense and abuse of a position of trust, her base offense level is increased by two levels, pursuant to U.S.S.G. §3B1.3.

The parties agree that Ms. Essex's base offense level should be decreased by two levels for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  Additionally, the parties agree that due to Ms. Essex's assistance in the investigation and prosecution of her misconduct by timely notifying the government of her intent to plead guilty, the government has indicated that it will make a motion for a decrease of one additional level for Ms. Essex's acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).  The parties therefore agree that Ms. Essex's base offense level is *19*, prior to considering any departures.

We respectfully request that the Court consider a downward departure of three additional points for "extraordinary restitution and acceptance of responsibility" pursuant to Ms. Essex's exceptional voluntary payment of restitution to her prior employer.  We respectfully submit that Ms. Essex has made extraordinary efforts to mitigate the effects of her criminal actions by liquidating and signing over practically every asset she had control over in an effort to pay restitution to her prior employer.  For the reasons that follow, we respectfully request that the Court grant Ms. Essex a downward departure.

**A.    There are special circumstances warranting a downward departure for Extraordinary Restitution**

This Court has discretion to depart from the Sentencing Guidelines if the Court finds "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately

taken into consideration" by the guidelines. *See* 18 U.S.C. 3553(b); U.S.S.G. 5K2.0. Before a departure is permitted, the Court must find that aspects of the case are "unusual enough for it to fall outside the heartland of cases in the Guidelines." *See Koon v. United States*, 518 U.S. 81, 98 (1996).

In the leading case on extraordinary restitution, the Fourth Circuit held that "restitution, although taken into account in the guideline permitting a reduction for acceptance of responsibility, can provide a basis for a departure when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'" *United States v. Hairston*, 96 F.3d 102, 108 (4th Cir. 1996. Restitution may constitute a basis for downward departure where "it shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *United States v. Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994). *See United States v. Oligmueller,* 198 F.3d 669, 672 (8th Cir. 1999); *United States v. Bennett,* 60 F.3d 902, 905 (1st Cir. 1995); *United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir. 1994). *See also United States v. Blakburn*, 105 F.Supp. 2d 1067 (D.S.D. 2000) (court granted downward departure to insure that restitution was made and placed defendant on a longer period of supervision in a failure to pay child support case where guidelines called for 12-18 month prison term); *United States v. Miller*, 991 F.2d 552 (9th Cir. 1993) (voluntary restitution exhibiting extraordinary acceptance of responsibility can justify downward departure); *United States v. Davis*, 797 F. Supp 762 (D.C.N. Ind. 1992) (8-level departure granted where defendant made voluntary restitution of $750,000). *See also United States v. Fagan*, 162 F.3d 1280, 1284-85 (10th Cir. 1998) (departure for extreme remorse "permissible factor" for departure if it is present to some exceptional degree); *United States v. Jaroszenko*, 92 F.3d 486 (7th Cir. 1996).

Allowing a sentencing court to depart from the Guideline range on the basis of extraordinary restitution adheres with the Sentencing Commission's express acknowledgment that "it is difficult to prescribe a single set of guidelines that encompass the vast range of human conduct potentially relevant to a sentencing decision." U.S.S.G. ch. l,pt. A, 4(b). The Eleventh Circuit recently reaffirmed this policy, asserting that "[i]nstead of concrete legal rules" courts look to a range of factors, including voluntariness, efforts to make restitution, percentage of funds restored, timing of restitution, and demonstration of sincere remorse and responsibility. *United States v. Kim,* 364 F.3d 1235, 1244 (11th Cir. 2004). *See also Oligmueller,* 198 F.3d at 672; *Hairston,* 96 F.3d at 108-09; *United States v. DeMonte,* 25 F.3d 343, 347 (6th Cir. 1994); *Lieberman,* 971 F.2d at 996.

**B.    Ms. Essex's Payment of Restitution Was Extraordinary When Compared with the Facts of Other Guidelines Cases**

Whether a factor is present to a degree not adequately considered by the Guidelines is "... determined in large part by comparison with the facts of other Guidelines cases." *Koon, supra,* 518 U.S. at 98. An examination of the cases where a defendant's restitution was found to be extraordinary and a downward departure reinforce the conclusion a departure is warranted in Ms. Essex's case.

In *United States v. Kim,* 364 F.3d 1235 (11th Cir. 2004), the defendants were charged with scheming to defraud approximately $268,237 from WIC, a program directed toward providing supplemental food and nutritional assistance to women, infants, and children. *Kim*, 364 F.3d at 1238. Following indictment, plea agreements were negotiated. *Id.* On their plea date, the defendants tendered $50,000 of personal funds as partial satisfaction of restitution. *Id.* At sentencing, defendants presented a check for the remaining restitution amount, and moved for downward departure under § 5K2.0 on the basis of extraordinary restitution. *Id.* Similar to the

11

case-at-bar, the Kim defendants obtained this money in a short amount of time. *Id.*  The Kim defendants relied upon securing loans from family and friends.  The Eleventh Circuit affirmed the District Court's downward departure, holding that the defendants' "payment of restitution was extraordinary enough to remove it from the heartland of cases because it demonstrated sincere remorse and acceptance of responsibility." *Id*. at 1244.

In *United States v. Bennett,* 9 F.Supp.2d 513, 516, 517 (E.D.Pa. 1998), *affirmed*, 161 F.3d 171, 178-79 (3rd Cir. 1998), the defendant, president of a charitable organization, defrauded various donors of approximately $350 million by falsely promising investors that they would double their contributions.  In actuality, the defendant repaid initial investors with funds received from subsequent investors. *Id.* at 517.  The defendant entered a conditional plea to 82 counts, including bank fraud, mail fraud, wire fraud, false statements, filing false tax returns, and money laundering. *Id.* at 516.  Prior to sentencing, the Bankruptcy Trustee had accomplished restitution of approximately $334 million, largely through the agreement of investors who had doubled their money, to return the funds they had received. *Id.* at 519.  The sentencing court held that:

> While the defendant did not demonstrate an acceptance of personal responsibility as contemplated by U.S.S.G. § 3E1.1, his close cooperation and his early turn over of the bulk of his personal and company held assets materially assisted the process of reducing the loss and occurred to an unusual degree. In these circumstances, the post-offense restitution was atypical and merited a downward departure under U.S.S.G. § 5K2.0.

*Id.* at 526 (citing *Lieberman*, supra, 971 F.2d at 995).

In *United States v. Oligmueller, supra*, 198 F.3d at 670, the defendant misrepresented the number of cattle he owned in order to obtain a loan from a bank.  When the defendant's fraud was discovered, he owed the bank approximately $894,000. *Id.*  Prior to his indictment, the defendant liquidated his assets, pledged other assets to the bank, which he had not previously pledged, took a second job, and set up a business in order to pay restitution to the bank. *Id.*

Through these efforts, the defendant was able to pay the bank approximately $808,000 in restitution. *Id.* On the basis of the defendant's efforts, the Eighth Circuit Court of Appeals affirmed the sentencing court's grant of a downward departure pursuant to Section 5K2.0. *Id.* at 672.

In *United States v. Crossey,* 1992 WL 80540 (N.D.Ill. 1992), the defendant, a bank employee, embezzled money from her employer over several years. The defendant "... ultimately informed her employer of her theft, arranged to make substantial restitution, made restitution in the amount of $145,000, and cooperated with the government, the bank, and the bank's insurance companies, in the investigation of her offense." *Id.* The district court found that the defendant's conduct constituted a reasonable basis for a downward departure. *Id.*

### C.    Ms. Essex's Extreme Remorse and Payment of Restitution Was Extraordinary, as such, a Departure is Warranted

We submit the circumstances and consequences in this case are atypical and take the case out of the guideline's heartland. As such, a departure is warranted on the grounds of Ms. Essex's remorse and early restitution.

Ms. Essex immediately confessed her crime when confronted and took immediate steps to make restitution to her prior employer. At the time, no criminal investigation was pending. Ms. Essex liquidated and handed over every asset that she had control over in an effort to pay restitution without thought of mitigation of any potential criminal sentence. Rather, due to her remorse, guilt, and her sense of responsibility, Ms. Essex immediately and voluntarily undertook to make restitution to her prior employer.

Like the defendant in *Crossey*, Ms. Essex cooperated fully with her prior employer in its investigation of the fraud and made arrangements to liquidate all of her assets in an attempt to provide restitution. Just as the defendant in *Oligmueller* liquidated many of his assets in order to

facilitate the payment of restitution, Ms. Essex liquidated **all** of her assets in an effort to repay her prior employer. She gave the deed to her family home to her prior employer. She surrendered her retirement account to her employer. She liquidated her personal possessions. Ms. Essex did everything in her power to try to make her prior employer whole, even while no criminal case was pending. Ms. Essex was not criminally charged until nearly two years after her fraud was discovered and long after she had made extensive, extraordinary steps to make restitution to her prior employer. Consistent with *Oligmueller* and *Crossey*, and *Kim*, Ms. Essex's restitution was extraordinary and "shows a degree of acceptance of responsibility that is truly extraordinary and substantially in excess of that which is ordinarily present." *Hendrickson,* 22 F.3d 170, 176 (7th Cir. 1994). Thus, we respectfully request that the Court grant Ms. Essex an additional downward departure pursuant to Section 5K2.0. We submit that an additional three point downward departure would be appropriate under the circumstances, thus reducing the guidelines point total to *16*.

## IV.   <u>SENTENCING UNDER *BOOKER*</u>

As the Court is well aware, the Sentencing Guidelines are no longer mandatory, they are merely advisory because of the Supreme Court's holding in *United States v. Booker*, 125 S. Ct. 738, 756 (2005). Under *Booker*, sentencing courts must treat the advisory guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors are:

1) the nature and circumstances of the offense and the history and characteristics of the defendant
2) the kinds of sentences available
3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct
4) the need to provide restitution to any victims of the offense.

A.    **Application of the Statutory Sentencing Factors to the Facts of Ms. Essex's Case**

In applying the § 3553 statutory factors to Ms. Essex's case, as discussed herein, a sentence below the guidelines is a just and result in this matter due to: Ms. Essex's lack of criminal record; Ms. Essex's positive and many contributions to her family; the anomalous circumstances Ms. Essex faced surrounding the commission of the offense; Ms. Essex's immediate and extraordinary acceptance of responsibility and restitution; and the extreme impact her offense has already caused her family, both financially and emotionally.

1.    **The Nature and Circumstances of the Offense and the History and Characteristics of Ms. Essex Warrant a Sentence Below the Guidelines In This Case**

As noted above, the motivation for this crime was Ms. Essex's desire, as a single mother, to provide for her family. When her conduct was discovered, she took responsibility and signed over and liquidated every asset she had to pay off the debts she had incurred.

When one balances this conduct against Ms. Essex's entire life, it is clear that this is a blemish on an otherwise impeccable and law-abiding record. Ms. Essex was and continues to be a good family member, and more importantly, she was (notwithstanding her conduct in this case), and still is, an exemplary mother and role model to her children. As such, based on Ms. Essex's exemplary background, the anomalous circumstances surrounding the commission of this offense, and Ms. Essex's positive post-offense conduct, a sentence below the guidelines would benefit Ms. Essex's family and the community as a whole.

2.    **A Sentence Below the Guidelines will Reflect the Seriousness of the Offense, Promote Respect for the Law, and Serve as Adequate Deterrence**.

Prior to the sentencing date in this case, Marilyn Essex was an honorable member of the community at large. Post sentencing she will be forever branded a convicted felon. She will

lose many of her civil liberties.    The stigma associated with the conduct has far broader implications for Ms. Essex.  She will be virtually unemployable.  If she does find employment, it will not be similar to her career in the financial industry and one can assume it will be at far less pay.  Ms. Essex realizes that she has no one to blame but herself.  We do, however, submit that the seriousness of this offense would clearly be reflected in any sentence that involves a sentence below the guidelines.  Moreover, given all that Ms. Essex has undergone in this matter, including the damage she caused her family and her reputation, that a sentence below the guidelines would promote respect for the law.  Furthermore, a message of both general and specific deterrence has already been sent.  There is no question that Ms. Essex will not violate the law again. Thus, a sentence below the guidelines in this case would be appropriate.

### 3.    The Remainder of the § 3553 factors Warrant a Sentence of Below the Guideline Range

We respectfully submit that the remainder of the §3553 factors support that a sentence below the guidelines is a just and fair sentence for Ms. Essex and the community.  Ms. Essex's lack of criminal record, positive and manifold contributions to her family, and the anomalous circumstances Ms. Essex faced surrounding the commission of the offense would not result in disparate treatment of similarly situated individuals.   Moreover, Ms. Essex's extraordinary acceptance of responsibility, in her immediate acknowledgment of her crime, her voluntary cooperation of her prior employer's investigation of the fraud and the subsequent extraordinary steps she took to make payment of restitution to her prior employer and finally, the devastation the offense has already caused to Ms. Essex and her family, both financially and emotionally, undoubtedly demonstrate that a sentence below the guidelines is just and fair in this matter.

**WHEREFORE,** for all the reasons set forth above, Defendant Marilyn Essex asks this Court to grant the 3-point downward departure that we seek based on Ms. Essex's extraordinary level of accepting responsibility.  In doing so, Ms. Essex's base offense level would be 16, which mandates a Guideline sentence of 21 to 27 months.   We would respectfully ask the Court sentence Ms. Essex to the low end of that Guideline range.  A 21-month sentence for Ms. Essex is more than sufficient to meet the balance of the factors set forth in 18 U.S.C. § 3553.


Respectfully submitted,

SCHERTLER & ONORATO, L.L.P.


_____/s/_____
David Schertler
Carroll Virginia Crumbaugh Love
601 Pennsylvania Ave. N.W.
North Building, 9th Floor
Washington, DC  20004
Telephone:  (202) 628-4199
Facsimile:  (202) 628-4177

# EXHIBIT 1

March 30, 2007


Honorable Judge
United States District Court
Constitution Avenue NW
Washington, DC 20001

RE:   Marilyn Essex
      Case #

Honorable Judge:

I am writing to you on behalf of my Sister Marilyn Essex. Having served more than 20
years as a member of the Washington, DC Police Department I understand the
seriousness of the charges to which my sister has plead guilty. However, as you prepare
to issue her sentence I feel as though I must try to explain her actions somewhat, in the
hope that you will be lenient on her.

Marilyn was the middle child in a family of nine kids raised by a single mother. Even
though our life growing up in the city was difficult we all turned out rather well. Until
this guilty plea none of us had ever been guilty of any serious crimes or incidents. In fact
two, including myself, retired from the Metropolitan Police Department. Almost all of us
were over achievers or exceeded the expectations that had been placed on us.

Marilyn was one that always had expectations on her. Being the middle child it fell to
her to take care of the four younger kids in the family as our Mother worked until late
evening. Marilyn would come home after school, and later work, and prepare dinner for
us kids and our Mother. She consistently did so, for many years, without complaint or
anger. Marilyn was the first in our family to complete High School. The first to
complete college. And the first to begin her professional career.

While I was growing up in junior high school and high school Marilyn consistently
loaned her car to me, even though I was an inexperienced driver, so that I could go on
dates or just hang out with friends. She never resented the fact that she had the only car
in the family and others relied on her for rides or support. Our Mother never learned to
drive and was completely dependant on Marilyn for rides to work or the grocery store.
Marilyn always provided assistance to us. She was always willing to help and support us.

This caring and giving attitude is why I believe that she committed the offenses that she
did. Marilyn took her divorce from her husband, and high school sweetheart, very hard.
It took her many years to overcome her hurt and anger of being abandoned to raise two
young daughters by herself. After being raised by a single Mother, Marilyn never
thought that she too would be a single parent of multiple kids with little income or
assistance from her ex husband. But she was now. Alone, scared, and broke, Marilyn
was too proud to ask her siblings for help or assistance. She had always been the

provider and support for all of us. How could she now ask us for assistance. Unfortunately, Marilyn made a mistake and took the wrong path. But knowing Marilyn as I do I know that she stole the money not for herself, but for her kids. She needed to make sure that they had what they needed and never felt as poor as she did as a kid.

Once caught, Marilyn didn't hide or lie about what she did. She admitted it immediately to her boss, much to my and her attorney's, disappointment. She immediately began to make restitution to her employer by selling all of her possessions and house. Marilyn didn't run from what she did. She tried to correct her mistake and make it right. Even then she was showing her daughters and us the right way to admit our mistakes.

You Honor, I ask that you show leniency to my sister, Marilyn Essex, in your decision as to her sentencing. She did not steal out of greed or selfish reasons, but to take care of her daughter.

Sincerely,

David B. McDonald

# EXHIBIT 2

13264 Cottage Grove Drive
Frisco, TX 75034

May 12, 2007

Dear Sir or Madam:

My name is Kristen Cole and Marilyn Essex is my mother. When I was seven years old and my younger sister, Ashley, was only two years old my mother became a single mother. My father paid child support as we were growing up and we went to his house every other weekend, but unfortunately that was the extent of our father's involvement in our lives. My mom was left to raise two young girls on her own.

Around the time my parents split up for good I was having difficulties in school. I was a quiet and shy child therefore I did not often receive the necessary attention by my teachers in the local public school I was attending. The overworked and overstressed teachers had to give the majority of their attention to the children who acted out and threw fits in class. Regrettably this resulted in my disadvantage both academically and socially in school. My mom was forced to make a difficult decision. She realized that our local public schools were not a positive environment for me and they were not going to improve as I got old. My mother chose to enroll me in a local Catholic school. She felt this would provide me with a better education for my future. My mother had to sacrifice more of herself at this time because my father refused to pay any money towards tuition. My mother worked full time while my sister and I attended school and/or daycare. My mother would rush home every night from work to pick us up on time then she would take us home a cook a nice dinner. My mom wanted to be sure that we sat down to dinner every night as a family. She could not provide us with every material item we wanted but she could make sure we were a family. On certain weekends a month my mom would work at our school's Bingo night in order to receive a discount on tuition.

Once Ashley reached school age she was also enrolled in private school. My mom was giving all the money she made over to us in the form of tuition and our needs as growing children and she was giving most of her time to us as well. Ashley and I grew up participating in various sports and activities. My mom was always sure to be at our events. Many of our friends came from families with two parents and still did not often have a parent present at games, recitals or other events. We could always count on our mother to be there for us. She truly sacrificed more than most parents to make sure Ashley and I never felt we were from a broken home.

As we got older and the costs of tuition and raising two girls increased my mother still did not received extra help from our father. Even as we went off to college the cost of tuition was left solely to my mom and any financial aid and scholarships we could receive. I know this was difficult on her and she managed as best she could. My mother always gave everything she could to my sister and me. It was always a rare event when my mother would buy something for herself or treat herself in any way. Whenever my mom went shopping and came home with something new just for Ashley and I would be very excited and proud of her.

Hopefully I have helped to show you that my mother is a very caring and generous person. She has never done anything to intentionally harm anyone. I truly believe that her actions are always with the best of intentions and she has always tried to help out her family and friends.

Sincerely,

*Kristen M. Cole*

Kristen M. Cole

# EXHIBIT 3

Jennifer Ann Pena
4 Shady Nook Avenue
Catonsville, MD 21228


To Whom It May Concern:

I have known Marilyn Essex since 1995. I attended the Academy of the Holy Cross in Kensington, MD for high school. During my time there I became close friends with Marilyn's daughter Kristen. Marilyn was always very involved in her daughters' lives whether it was to make sure that they excel in academics or enjoying their youth without getting in trouble. She made it a point to know all of her daughters' friends including myself. As the years went by I got to know Marilyn better. She would invite me over for family dinners and always included me for holidays with her family. I was raised in a very different environment where my family never spoke or seemed like much of a family. Every time I was at Marilyn's house I knew what a real family was like. You could feel the love in the air and I knew that she always wanted more for her children then she ever had and above all she wanted them to be happy. Time progressed and her daughter and I went off to different colleges. During school breaks I would find myself at Marilyn's house once again eating dinners with her. At this time Ashley was starting high school and I could tell that Marilyn felt the same towards her friends. After college I began working in Baltimore for a real estate firm, but I still maintained contact with Kristen and Marilyn. After about a year I was put in a bad situation where both of my roommates did not want to renew our lease and I was not welcome to move back home with my parents. I knew I could not afford to get another apartment without roommates and I became very worried about what to do. Without a thought Marilyn told me to stay with her until I could get myself on my feet again. Marilyn was living alone with Kristen living in Virginia and Ashley at college and she still offered to have me stay with her. At first I was a little worried about how it would be to live with one of my friend's mothers. But I soon realized she was more then that, she was actually a mother to me. She took me in when I had nowhere to go. She was there to listen to me when I was upset or when I was happy. The 5 months I lived with Marilyn was an extremely special time for me. I was eventually able to move out into a place closer to work and got a roommate. She made it a point to come up and visit me after I moved out to check on me and make sure that everything was going well. The past 12 years that I have know Marilyn seem to have flown by but I know I will never lose the relationship that I have with her. I continue to see her on holiday and other days. I will always be gratefully for everything that she has done for me and for her ability to care for me as her own daughter.


Sincerely,


Jennifer Pena

# EXHIBIT 4

Virginia A. McDonald
27311 Queentree Road
Mechanicsville, MD  20659


May 7, 2007


Dear Honorable Judge:

I am writing this letter on behalf of my sister, Marilyn Essex, whom will be in front of your court for punishment of a serious crime of embezzlement.  She and her family are aware that she needs to be punished for what she did, but I am asking you to please have some mercy.

Only Marilyn knows why she believed that was the only way she could make ends meet.  No one in her family even knew she was doing anything wrong until it was too late.  If only we had seen something, a sign, any indication that she was committing a crime.  There was nothing there -- she did not drink or do drugs.  To all of us, it just looked like she was working hard and making good money.

Her unfortunate mistake has made me look back to try and understand my sister and brothers.  When I ask them what they remember of how we grew up, each one of us has a different story.

Our mother was a very proud person.  She believed that you did not ask for help and you did not accept any help from the government, state or federal.  With nine children to raise, my mother accomplished a lot on her own.

Marilyn was the fifth child.  I know that she had a lot of responsibility for someone so young – we all did.  The first four children went to work as soon as we possibly could to help our mother.  Out of the oldest four, only one elder brother graduated from high school and immediately went into the Army.  Our oldest sister had a baby at the age of sixteen and our mother took this child to raise.  When I turned sixteen, the oldest sister had a second child who was seriously disabled and mentally retarded.  As a result, I quit school to work and help with this child.

That is when my sister, Marilyn, started to help take care of the other children.  I stayed home during the day to clean and look after my retarded niece until school was out then I went to work.  Marilyn was just barely old enough then to look after the younger children until our mother got home from work.  I also had a child at the young age of nineteen.  Shortly thereafter, Marilyn was the first and only daughter to graduate from high school and immediately went to work to start helping the family.

Marilyn soon met a very nice man that the family believed had a good upbringing and was much more financially stable than we were.  Suddenly, at the age of 51, our

mother had a stroke and was left paralyzed, partially blind, and unable to speak. Marilyn was planning her wedding at the time and decided to have someone videotape the wedding just so our mother could be a part of her first daughter's wedding.

Our family was lost without our mother and we each tried to make sense on how to go on without her strength. Our mother lasted seventeen years in a nursing home and just watching week-by-week, month-by-month, year-by-year as she struggled with the after effects of the stroke was worse for some of us than others. During this time our youngest brother committed suicide and our oldest brother died of bone cancer. We also learned that our parents were never married and our father had another separate and distinct family.

Those early years, Marilyn was happily married and had everything she ever dreamed of -- a husband, house of her own, and kids..... in that order. At least that's what we all believed. Until her husband announced he was cheating on her, left her and their two children with as little as possible. She tried to be the best parent she could.

If only one of us knew she had money problems, maybe things would be different. Each of us has that pride our mother gave us and sometimes falsely convinces ourselves that everything will be fine. Unfortunately, Marilyn made some really poor decisions and took inappropriate actions to make things, in her mind, fine. Obviously, she was wrong.

Please your honor, we know Marilyn did wrong and certainly needs to be punished, but for her children and her family, please have mercy with your sentencing.

Sincerely,

Virginia Anne McDonald
27311 Queentree Road
Mechanicsville, MD 20659
(301) 373-3029

# EXHIBIT 5

# Martha P. Carroll

41855 Queens Landing Road, Mechanicsville, MD  20659                    (301) 373-3010

April 27, 2007

To Whom It May Concern:

I have known Marilyn McDonald Essex and her entire family for 32 years. Marilyn's oldest sister, Barbara Bowden, and I have operated a day care business for 32 years. During this time, although we are not related, I have become an extension of the McDonald family and gotten to know all of the family members very well.

The Marilyn that I know is kind-hearted, loving, devoted and dependable. She has and would come help anyone that she knows anytime, night or day, if they needed it. She gives of herself at the drop of a hat. She'd give a helping hand and walk your dog or go to the store for you. She has been there for every sick person she knows to babysit, take them to the doctors, or just sit patiently by the bedside offering support and companionship. There aren't too many people in this day and age that are there to help, you can count on, and are willing to help without any expected payback. Marilyn is one of the few left.

In fact, when my mother died, she was right by my side. And, since I am an only child, it was very nice and extremely comforting to have a friend I could go on and on with. As you must have figured out by now, I think she and her family are good people. I love them all. I have never known a family so close and loving. Joyfully, they spend every holiday together, at least one weekend a month together and talk on the phone 2 to 3 times each and every week.

Marilyn has two beautiful children – Kristen and Ashley. They are her world. Marilyn's oldest child, Kristen, is planning and hoping to get pregnant and have children in the very near future. The youngest, Ashley, will graduate from college in May. It has always been just the three of them. In the event she is sent to prison, they have no idea what they are going to do without their mother – even for a short period of time.

I have no idea what made her make bad choices, but the Marilyn that I know is a wonderful person. She wouldn't have intentionally done harm to anyone. I know she needs to be punished and I feel she is truly sorry. I feel prison will not help her. I feel she needs professional counseling and community service -- something to help other women who are very needy but are trying to get work and have a safe and secure place to live. Please take into consideration the family and her children in the sentencing.

Sincerely,

Martha P. Carroll

# EXHIBIT 6

62 South 16th Street Apt 2
Pittsburgh, PA 15203

To Whom It May Concern:

My name is Ashley Essex and I am Marilyn Essex's youngest daughter. I want to start by saying no words could actually express how much I love my mother. When I was two years old my parents separated. Except for the child support and the occasional visit to my father's house, my mother has been the one who raised and supported me throughout my life.

My mother made sure that, growing up my sister, Kristen, and I always had the best possible education. She wanted to make sure we never missed any opportunities in our life. However, being a single mother and having a full time job this was never easy, yet she would never let my sister and I see how much she struggled and sacrificed. She always made sure we were involved in sports and other activities, and even if we did not excel, she was always proud of us. There has not been a time in my life where I felt I could not go to my mother with a problem or when I needed help. My mother has supported me in ever decision I have made.

My mother's helping nature did not end with just my sister and me, if anyone in our family or even our friends was in trouble or needed help, my mother was always there, and she never once asked for anything in return. In fact any money my mother made went towards my tuition, my sister's tuition or anything else we needed. My mother made sure we never felt at a disadvantage living with a single parent, and I can honestly say I feel as though I did not miss out on anything in my life. She made sure that we had family dinners every night and always talked about how our day was.

I remember one time in high school, we went on a retreat and during this retreat we were asked to say who our hero was. I thought for a second and I said my mother. When asked why, I simply said she is the strongest and greatest person I know. To this day, I know if someone were to ask me that same question, my answer would not change. I know without my mother and her strength and kindness I could have never accomplished the things I have done. I attended catholic elementary school followed by a catholic High school. I then went on to attend Duquesne University on an academic scholarship. I have recently graduated from Duquesne University with a Bachelor in Business Administration. However, none of this would have been possible without my mother always being by my side and supporting me.

I hope I have provided you some insight on just how my mother has helped me in my life, and I know there are many other people she has helped too. My mother would never intentionally hurt someone, and I truly believe she is one of the kindest and good-hearted people I have known.

Sincerely,
Ashley Essex

# EXHIBIT 7

Deidre S. Putney
8714 Pintail Point
San Antonio, TX 78239

May 2007

Dear Sir or Madam:

I am writing this letter to you on behalf of my sister Marilyn Essex. Although I firmly
believe she should be punished for her actions, I am hoping an explanation of her
background will give you reason to show mercy with your judgment. There is no excuse
for what she has done, she has committed a crime, and she needs to realize there are
consequences for her actions. She has hurt many people, including her family members.
Whatever judgment you give, I believe most of all she needs counseling and
psychological help. I think Marilyn was unable to deal with her childhood and as a result
of this has made very poor decisions as an adult.

Marilyn is the fifth of nine children. My mother raised all nine children primarily by
herself. My father was an abusive alcoholic who beat my mother in front of us during the
few times he was present in our home. We later learned at his funeral that he in fact had
another family and this was the reason for his frequent absences. Because of these
circumstances Marilyn, from a very young age, was given a lot of responsibility, maybe
too much for a child to handle.

Our older sister had two children before the age of nineteen. One of these children was
born mentally retarded and Marilyn was one of the primary supporters of this child.
Throughout all of this, and with very little in the way of role models, Marilyn graduated
from high school and eventually put herself through college. She was the first one in our
family to even attend college much less graduate.

When Marilyn was a teen she met her future husband. At this time Marilyn believed he
was going to give her the life she always wanted. They eventually married, and had two
beautiful girls, Kristen and Ashley. After a period of time he confessed to having an
affair and left her and their two daughters for another woman. Marilyn was forced to
raise her two daughters on her own. Her oldest daughter Kristen graduated from college
a couple of years ago and Ashley is graduating this semester.

Marilyn has literally come from nothing, and with absolutely no one showing her the way
put herself and her two daughters through college. I firmly believe that my sister is a
good person, however, I also believe she needs help. Her past struggles and rough
childhood have absolutely influenced her actions, as wrong as they have been.

Most importantly of all her past can no longer affect her two daughters. Our family's cycle of struggle is finally being pushed aside and Marilyn has to get the help she needs so that the cycle does not continue on through her daughters. She is very close to her two daughters as you can imagine. I am asking that you provide her with the help she needs.

Thank you in advance for your time on this difficult matter.


Deidre S. Putney

# EXHIBIT 8

# Barbara Bowden

41855 Queens Landing Road, Mechanicsville, MD 20659          (301) 373-3010

April 30, 2007

To Whom It May Concern:

    I am writing this letter on behalf of Marilyn McDonald Essex, my younger sister. Marilyn is one of nine children. Throughout her childhood she was straddled with a lot of responsibility. Our father was an absent alcoholic. Our mother worked extensively as for the Federal Communication Commission. She did her best to keep us out of trouble, teach us morals and principles, and keep a roof over our heads. As a result, we grew up very poor and depended on one another for the necessities in life. Marilyn was charged with fixing dinner and taking care of her four younger siblings – three boys and a girl.

    As a young adult, Marilyn met who she hoped would be her future husband, Tom Essex. She expected Tom would take her away from a life of poverty and show her a new beginning. In fact, when she met her future husband, she truly believed he was going to save her and remove her from a dysfunctional family to a higher-class functional family. Her brother-in-law was a priest. The Essex family members each owned their own homes and were quite comfortable financially. Marilyn was living her own little fairytale. She was the first in our family to graduate from high school. She was the first in the family to graduate from college. She was also the first in the family to own her own home. She traveled to distant places, had more material things than she had ever seen in her entire life, and eventually, after a number of years of marital bliss, decided to have children.

    Unfortunately, that life as she knew it quickly ended and turned out to be fake. As soon as her parent-in-laws passed away, her husband openly acknowledged that he had been cheating on her and ultimately filed for divorce. His actions left her devastated, feeling rejected, and with two very young children to raise as a single parent – a place she swore she would never be. She intentionally waited to have children until she was sure she could give them everything she never had.

    I am in no way attempting to justify the actions that got her into this. The road she took was not the right one and her actions were in fact, criminal. I am, however, trying to get you to appreciate how difficult her life has been and to understand that in her mind, she had no other choice. She could not see bringing herself or her children back to a place of poverty she knew all too well.  She absolutely needs professional counseling . . . not imprisonment. She needs to be able to see pride in her accomplishments as a daughter, sister, wife, and mother. She needs help in gaining a

different perspective from the depths that she came in comparison to where she is and could be in life.  She needs to be able to watch her two beautiful daughters grow into young professional women.   I am asking that you see Marilyn as I do – a loving, caring person, devoted mother, daughter, and sister who needs professional psychiatric help.

I am 62 years old and in poor health.  If she is sentenced to prison, I can only hope and pray to see her again.  Please consider probation under house-arrest, stringent community service, and some form of counseling.  I do believe that she recognizes the mistakes that she has made and is totally willing to make amends.  Paying restitution from prison is nearly impossible.

Sincerely,

Barbara Bowden